# EXHIBIT A

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

June 08 2026 1:32 PM

PIERCE COUNTY CLERK
NO: 26-2-09143-4

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
PIERCE COUNTY

**MARIAH MEADE**, on her own behalf and on behalf of others similarly situated,

Plaintiff,

vs.

**THE LIV GROUP, INC. d/b/a LIQUID I.V.**,

Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

Plaintiff Mariah Meade, on her own behalf and on behalf of others similarly situated, on information and belief except to her own experiences and matters of public record, complains of Defendant The LIV Group, Inc. d/b/a Liquid I.V. ("Liquid I.V." or "Defendant") as follows:

## I. INTRODUCTION

1. In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2. Among other things, CEMA prohibits transmitting a commercial email with "false or misleading information in the subject line" to the email address of a Washington resident.



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

RCW 19.190.020(1)(b).

3. Liquid I.V. engages in the precise activity which CEMA prohibits.

4. Liquid I.V. spams Washington consumers, including Plaintiff, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with Defendant's marketing efforts for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act—*i.e., purchase*—is short.

6. And through this deceptive time-sensitivity, Liquid I.V. falsely narrows the field—steering consumers away from shopping for better deals—to its own products and services, which must be purchased *now*.

7. Plaintiff challenges Defendant's harassment of Washington consumers with deceptive marketing for violations of the Commercial Electronic Mail Act (RCW 19.190.020) and the Consumer Protection Act (RCW 19.86.020) for injuries caused, additionally seeking injunctive relief against such violations in the future.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in Pierce County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in Pierce County.

## III. PARTIES

10. Plaintiff Mariah Meade is a resident of Pierce County, Washington.

11. Defendant The LIV Group, Inc. d/b/a Liquid I.V. is a stock corporation incorporated in Delaware, with its principal address at 111 River Street, 8th Floor Hoboken, New Jersey.

## IV. FACTUAL ALLEGATIONS

### A. CEMA protects Washington consumers from deceptive spam emails.

12. The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

13. In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

14. While it's been nearly three decades since CEMA's enactment, the problems caused by unsolicited commercial email, *i.e.,* spam email, have grown exponentially.

15. The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

16. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

17. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

18. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

19. Consumers therefore routinely "consent" to receive flurries of commercial emails that they did not meaningfully request and in which they have no genuine interest.

20. This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

21. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

22. The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting, among other things, commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

23. CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

24. CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn.2d at 836.

25. CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

26. CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

27. CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

28. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B. The subject lines of Liquid I.V.'s marketing emails make false time scarcity claims.**

29. One common way online marketers "manipulate consumer choice by inducing false beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce.



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

30. The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patterns to Light*, *supra* para. 29, at 22.

31. "False or misleading scarcity claims can change the behaviour of consumers." *Online Choice Architecture, supra* para. 29, at 27.

32. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

33. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

34. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

35. Under time pressure, "consumers might take up an offer to minimize the uncertainty of passing it up." *Id.*

36. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit.*

37. Indeed, one 2019 study found that "customers who took timed deals rather than



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

38. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

39. These false time scarcity claims are a staple of Liquid I.V.'s email scheme to compel consumers to purchase its products.

40. Liquid I.V. manufactures and sells powdered oral rehydration solutions that use hydration multiplier technology which improves water absorption and counteracts dehydration.[1] The company's merchandise is available online at https://www.liquid-iv.com/.

41. To advertise its products and encourage online purchases, Liquid I.V. spams consumers with emails promoting deals on its products.

42. **Urgent Spam Emails.** Unfortunately for those email recipients, Liquid I.V. regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples discussed below.

43. For years, Liquid I.V. has engaged in a consistent pattern of advertising deals on its products that it initially promotes through spam emails announcing the offer, promotion, or sale.

44. Liquid I.V.'s deceptive strategy is no more readily apparent than in its promotion increases. In these examples, Liquid I.V. emphasizes the impending deadline of a sale or promotion, but then offers the same items at a greater discount shortly thereafter.

45. Once it has hooked consumers on the advertised promotion—often branded with a seasonal theme—Liquid I.V. uses the subject lines of follow-up emails to present the deal as a scarce or time-limited opportunity. This strategy commands consumers' attention and pressures them to make online purchases before Liquid I.V.'s false "deadline." Then, once the originally advertised "deadline" has passed, Liquid I.V. knowingly offers materially better discounts shortly thereafter.

---

[1] *About Us*, LIQUID I.V., https://www.liquid-iv.com/pages/about-us (last visited June 8, 2026).



**STRAUSS BORRELLI PLLC**
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

46. While Liquid I.V. may present these discount increases as though they are a favor or unexpected blessing to consumers, they are anything but. By deploying false time pressure with surprise extensions—which are only disclosed once the original promotion has ended—Liquid I.V. compels consumers to purchase quickly while withholding terms that consumers need so they can make informed buying decisions.

47. This misleading marketing strategy allows Liquid I.V. to maximize sales during both the initial promotion and the subsequent increase.

48. Liquid I.V. used this deceptive increase practice for its Early Bird Black Friday Sale in November 2024.

49. On November 20, 2024, Liquid I.V. sent consumers an email with the subject line: “25% OFF ENDS TONIGHT[.]” The body of the email confirmed that the promotion offering 25% off was ending that same night.

50. Yet the very next day, on November 21, 2024, Liquid I.V. sent an email to consumers with the subject line: “30% OFF?!” The preview text of the email informed consumers that “ 🔔 BLACK FRIDAY STARTS NOW[.]” The body of the email emphasized that “Black Friday Starts Now” and consumers could save 30% off of Liquid I.V.’s powdered hydration products.

51. The false scarcity manufactured by Liquid I.V. in its November 20 email might compel a consumer to take urgent action and purchase a product using the 25% off discount, only to *miss out* on the 30% off deal offered just days later.

52. Liquid I.V. has used other deceptive practices in its promotions as well.

53. For example, Liquid I.V. also uses fake promotion extensions. Liquid I.V. announces promotional pricing, presenting that pricing as a scarce or time-limited opportunity. Once the advertised deadline has ostensibly passed, Liquid I.V. “extends” the promotion to a new end date.

54. Liquid I.V. did so for its Black Friday sale on November 24, 2023, in an email with the subject line: “ENDS TONIGHT ♈ [.]” Text in the body of the email emphasized that the sale



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

was 30% off sitewide and consumers had to "[h]urry, [because the] sale ends tonight."

55. But there was no need for consumers to "hurry" on Black Friday, because on November 25, 2023, Liquid I.V. sent an email to consumers with the subject line: "30% OFF EXTENDED ✵" Text in the body of the email made it clear that the sale was extended through the weekend and consumers had more time to save 30% off sitewide.

56. Liquid I.V.'s "ENDS TONIGHT" representations in its November 24 subject line was not true. Consumers had the rest of the weekend to save 30% off on the Black Friday deal.

57. Liquid I.V. used the same technique for its Black Friday sale the following year. On November 29, 2024, Liquid I.V. sent an email to consumers with the subject line: "THE COUNTDOWN IS ON 😵[.]" The body of the email informed consumers that they had "ONE DAY ONLY" to save 30% off and receive a free tumbler on orders of $75 and over.

58. Later that same day, Liquid I.V. send another email to consumers with the subject line: "ENDS TONIGHT!!" and with the preview: "Free gift + 30% off[.]" The body of the email warned consumers they only had "HOURS LEFT" to save 30% off and get a free tumbler on orders $75 and over.

59. The very next day, on November 30, 2024, Liquid I.V. emailed consumers with the subject line: "SALE EXTENDED!? 👻[.]"

60. Thus, one day after warning consumers that they only had one day to access the Black Friday 30% off and free tumbler deal, Liquid I.V. purported to extend the sale, showing that the information in the November 29 subject line was false and misleading. The false deadline was simply a marketing strategy meant to compel consumers to purchase items from the Defendant's website faster.

61. Another example comes from Liquid I.V.'s Labor Day sale in September 2025.

62. On September 1, 2025, Liquid I.V. sent consumers an email with the subject line: "FINAL HOURS TO SAVE 25% OFF" and preview text stating: "Back to full price tomorrow[.]" The body of the email emphasized that it was the "last chance to grab 25% off" and "get 2 FREE sticks on orders $60+."



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

63. Later that same day, at 11:25 am EDT, Liquid I.V. sent consumers another email with the subject line: "25% OFF ENDS TONIGHT[.]" The body of the email warned that consumers only had "12 HOURS LEFT" to get 25% off and "2 FREE sticks on orders $60+."

64. But Liquid I.V. did not go "back to full price" the next day. On September 2, 2025, Liquid I.V. sent an email to consumers with the subject line: "EXTENDED: 25% Off + Free Sticks[.]"

65. Contrary to Liquid I.V.'s "FINAL HOURS" invocation on September 1, consumers in fact had additional time to make use of the Labor Day promotion. The emails on September 1 were misleading because the subject lines contained false information designed to make consumers feel urgency based on incorrect information.

66. Liquid I.V. repeated this trick later that same year for its Cyber Monday deal.

67. On December 1, 2025, sent an email to consumers announcing that "CYBER MONDAY STARTS NOW[.]" The body of the email informed consumers they could get 30% off sitewide and warned that the "FINAL SALE OF THE YEAR ENDS TONIGHT[.]"

68. Later that same day, Liquid I.V. sent another email to consumers with the subject line: "Cyber Monday ends TONIGHT[.]" The body of the email reminded consumers they could get 30% off sitewide.

69. Yet, the very next day, Liquid I.V. sent consumers an email with the subject line: "30% OFF for 48 hours only[.]" The body of the email informed customers that the "BLACK FRIDAY SALE EXTENDED" and they had 48 more hours to save 30% off sitewide.

70. Thus, one day after warning consumers that it was their last chance for the rest of the year to access a 30% discount sitewide, Liquid I.V. extended the same deal the very next day. Thus, the false deadline in the December 1 subject line was simply a marketing strategy meant to compel consumers to purchase items from the Defendant's website faster.

71. In short, Liquid I.V. engages in different email marketing strategies whereby it creates a false sense of urgency, misrepresents when sales end, and then arbitrarily extends or increases those sales to further pull in consumers with subject headings that are just not true.



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

**C. Liquid I.V. knows when it sends emails to Washington residents.**

72. A sophisticated commercial enterprise like Liquid I.V., which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly within its knowledge.

73. First, the sheer volume of email marketing that Liquid I.V. engages in puts it on notice that Washington residents would receive its emails.

74. Second, Liquid I.V. may obtain location information tied to email addresses when consumers make purchases from its digital platforms, including https://www.liquid-iv.com/, or otherwise self-report such information to Liquid I.V.

75. Third, Liquid I.V. may obtain location information tied to email addresses by tracking the IP addresses of devices used to open its emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/). Liquid I.V. is likely able to infer the general geographic location of recipients by state based on their IP address at the time of email open or link click.

76. Fourth, Liquid I.V. may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

77. Fifth, Liquid I.V. may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

78. Sixth, Liquid I.V. may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

79. It is thus highly probable that a seller with the size and sophistication of Liquid I.V.



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

### D. Liquid I.V. violated Plaintiff's right under CEMA to be free from deceptive commercial emails.

80. Liquid I.V. has spammed Plaintiff, a Washington citizen, with commercial emails whose subject lines contain false or misleading statements in violation of her right to be free from such annoyance and harassment under CEMA.

81. For example, Plaintiff has received emails containing false or misleading subject lines sent by Liquid I.V., as described above in Section B. These messages, as well as the subsequent messages evidencing their deception, were sent to Plaintiff's personal Gmail address:

82. Plaintiff received the email described *supra* at ¶ 54 sent on November 24, 2023, with the subject line: "ENDS TONIGHT [.]"

83. Plaintiff received the email described *supra* at ¶ 58 sent on November 29, 2024, with the subject line: "ENDS TONIGHT!!"

84. The subject lines of these emails were false or misleading in violation of CEMA, for misrepresenting the timing of the deals, and as further described herein.

85. These emails' subject lines contained false statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V. CLASS ALLEGATIONS

86. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington citizens holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

87. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

88. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

89. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

90. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

91. There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the Consumer Protection Act, RCW 19.86.020 (CPA); and whether Defendant's should be enjoined from such conduct.

92. Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class Members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative Members.

93. Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; has no interest adverse to the Class; and has retained competent counsel extensively experienced in consumer protection and class action litigation.

94. Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiff and all Class Members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

95. The questions of law or fact common to the members of the Class predominate over


STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class Member and that Class Member's resulting damages.

96. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation, and management of this action as a class presents no special difficulties.

## VI. CLAIMS TO RELIEF

### First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

97. Plaintiff incorporates and realleges paragraphs 1–86 above.

98. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

99. Defendant is "persons" within the meaning of CEMA. RCW 19.190.010(11).

100. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

101. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiff and putative Members were Washington residents as such "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW 19.190.020(b)(2).



STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

102. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

103. For Defendant's violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

**Second Claim to Relief**

**Violation of the Consumer Protection Act, RCW 19.86.020**

104. Plaintiff incorporates and realleges paragraphs 1–86 above.

105. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

106. A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

107. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

108. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

109. Defendant is "persons" within the meaning of CEMA. RCW 19.190.010(11).

110. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

111. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

112. Defendant initiated the transmission, conspired with another to initiate the


STRAUSS BORRELLI PLLC
980 North Michigan Ave., Suite 1610
Chicago, Illinois 60611
TEL. 872.263.1100 • FAX 872.263-1109
straussborrelli.com

transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

113. For Defendant's violation of the CPA, Plaintiff and putative Members are entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of the suit, including a reasonable attorney's fee.

## VII. PRAYER FOR RELIEF

Plaintiff asks that the Court:

A. Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C. Enter a judgment in Plaintiff's and the Class's favor, awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiff's costs of suit, including reasonable attorneys' fees; and

E. Order such further relief as the Court finds appropriate.

Dated: June 8, 2026

By: */s/ Samuel J. Strauss*

Samuel J. Strauss, WSBA No. 46971
Raina C. Borrelli*
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiff*

*** Applications for admission *pro hac vice* forthcoming**